Filed 2/13/26  P. v. Hepburn-Martin CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046342 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1497284) |
| v. | |
| AVAILEK HEPBURN-MARTIN et al., | |
| Defendants and Appellants. | |

In 2017, a jury convicted Miguel Antonio Cornejo and his codefendant, Availek Hepburn-Martin, (collectively "appellants") of two counts of second degree murder (Pen. Code, § 187, subd. (a); counts 1 and 2),[1] one count of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4); count 3), and one count of assault with a firearm (§ 245, subd. (b); count 4).  The trial court sentenced appellants to identical indeterminate terms of 55 years to life consecutive to determinate terms of seven years.

On appeal, appellants jointly argue that the trial court committed instructional error in that it: (1) failed to instruct the jury on the second degree murder charges that it must find they personally acted with malice as aiders and abettors; and (2) improperly instructed the jury on the now invalid natural and probable consequences theory of murder liability.  Appellants also jointly argue

---

[1] Unspecified statutory references are to the Penal Code.

that their convictions must be vacated because the trial court repeatedly used "racially discriminatory language" throughout the trial proceedings in violation of the Racial Justice Act (RJA). Finally, appellants argue they are entitled to a remand for resentencing so that the trial court can exercise its discretion to decide whether to strike the firearm enhancements imposed in connection with count 1 in favor of imposing a lesser firearm enhancement and, if this claim is deemed forfeited due to trial counsels' failure to object, they each received ineffective assistance of trial counsel.

Hepburn-Martin separately argues that, due to intervening changes to the law of murder, the trial court's instructions to the jury on felony murder are now erroneous. Hepburn-Martin further argues that the cumulative impact of the instructional errors he has raised, both individually and in concert with Cornejo, deprived him of his right to a fair trial. Finally, Hepburn-Martin contends that the trial court applied an incorrect standard of review when evaluating his motion for a new trial.

As we explain below, we conclude that the jury instruction relating to aider and abettor liability for murder was erroneous as it failed to instruct the jury that it had to find appellants personally acted with malice, and the Attorney General has failed to prove that this error was harmless beyond a reasonable doubt. Based on these conclusions, we need not reach appellants' joint argument that the jury was erroneously instructed on the now invalid natural and probable consequences theory of murder liability or Hepburn-Martin's separate arguments that the court erred in giving a now-erroneous instruction on felony murder and that the instructional errors were cumulatively prejudicial. We also need not reach appellants' claim that they are entitled to resentencing on the firearm enhancements imposed in connection with count 1. However, we do not find the

2

trial court erred in denying the motion for new trial or that appellants have met their burden of proving that the trial court's comments violated the RJA. We will therefore vacate appellants' second degree murder convictions and remand the matter for possible retrial on count 1 and count 2 and associated enhancements.

## I.  FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Procedure

#### 1. Charges, verdict, and sentencing

On April 7, 2016, the Santa Clara County District Attorney filed a first amended information charging Cornejo, Hepburn-Martin, and Tearri Richard with two counts of first degree murder (§ 187, subd. (a); counts 1, 2) and three counts of assault with a semiautomatic weapon (§ 245, subd. (b); counts 3, 4, 5). The information further alleged that, as to count 1, Cornejo and Hepburn-Martin personally used a firearm causing death or great bodily injury (§ 12022.53, subds. (b), (c), (d)). Finally, the information alleged as special circumstances that the murders (counts 1 and 2) were committed while the three defendants were engaged in robbery and burglary as well as that the three defendants had been convicted of more than one murder in this proceeding. (§ 190.2, subd. (a)(17), (3).)

After a jury trial, Cornejo and Hepburn-Martin were found guilty of two counts of second degree murder (counts 1 and 2),[3] and one count of assault with a firearm (count 4).[4] On count 3, the jury found appellants not guilty of assault with

___

[2] This court granted Hepburn-Martin's request for judicial notice of the record in the related appeal (H049531, H049539) from the trial court order denying appellants' petitions for resentencing under section 1172.6.

[3] The jury found both appellants not guilty of first degree murder in counts 1 and 2 and consequently made no findings on the special circumstances allegations associated with the first degree murder charges.

[4] The jury acquitted Richard on all charges.

a semiautomatic firearm but found them both guilty of the lesser included offense of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4)). The jury acquitted appellants of the final count of assault with a semiautomatic firearm (count 5). The jury also found true the allegation attached to count 1 that appellants personally discharged a firearm causing death or great bodily injury. The trial court sentenced both Cornejo and Hepburn-Martin to indeterminate terms of 55 years to life consecutive to determinate terms of seven years.

Hepburn-Martin and Cornejo timely appealed.[5]

### 2. Petitions for resentencing

On April 10, 2019, Cornejo and Hepburn-Martin filed separate petitions for resentencing under section 1172.6, alleging that the prosecution had proceeded on the theory that they were guilty of first or second degree felony murder, and they could no longer be convicted of first or second degree murder under the current law. The trial court issued an order to show cause, finding that the petitions established a prima facie case for relief.[6] The parties stipulated to admitting new evidence for the trial court's consideration in connection with the section 1172.6 hearing. The evidence consisted of certain postings on former codefendant Richard's social media accounts, as well as messages and photos found on his cellphone, from both before and after the murders. The photos showed Richard holding various types of guns, and the text messages referred to weapons that Richard was trying to sell. In addition, Hepburn-Martin introduced evidence that, in 2019, Richard shot and killed someone during a road rage incident.

---

[5] This court stayed the appeals and remanded appellants' cases to the trial court for the limited purpose of conducting proceedings pursuant to former section 1170.95 (now section 1172.6).

[6] After the trial court issued an order to show cause on the petitions, the district attorney sought writ relief from this court. We summarily denied the district attorney's writ petition by separate order on May 10, 2021 (H048945).

At the outset of the section 1172.6 hearing, the trial court presented the parties with an eight-page "rough written [s]tatement of [d]ecision[,]" asking the parties to review it and provide their thoughts "so that if I am obviously incorrect about something, I can fix it now rather than down the road when this matter gets reviewed." The district attorney pointed out the decision repeatedly used the phrase "probable cause" rather than "prima facie case" in discussing the initial threshold for scheduling an evidentiary hearing on a petition for resentencing under section 1172.6. The court responded, "I'm old school and I tend to use old terms, but I'll change that now." At the conclusion of the hearing, the trial court stated, "The motions are denied" but made no reference to its written statement of decision as setting forth its findings and reasoning in the matter.[7]

By separate order dated May 19, 2022, we granted Hepburn-Martin's motion to augment the record to include the trial court's unsigned order. In that document, the court wrote that the People had proved beyond a reasonable doubt each element of implied malice second degree murder under current law and that both Cornejo and Hepburn-Martin were "guilty of implied malice murder in part as the actual perpetrator and in part as the aider and abettor." However, the decision still uses the phrase "probable cause" rather than "prima facie case," reflecting that this version of the document did not incorporate the modifications discussed at the hearing.

This court affirmed the trial court's orders denying the petitions for resentencing in a nonpublished opinion. (*People v. Hepburn-Martin* (Oct. 13, 2023, H049531, H049539 [nonpub. opn.] (*Hepburn-Martin*)).) By separate order

---

[7] After Hepburn-Martin and Cornejo appealed from the trial court's orders denying their petitions for resentencing, this court stayed briefing in the instant appeal (H046342) pending disposition of those appeals (H049531, H049539).

dated January 31, 2024, this court lifted the stay in the instant appeal from the judgments of conviction.

### B. Facts[8]

#### 1. The prosecution case

##### a. Alejandro Solorzano's testimony

Solorzano sold marijuana for Bryan Lang[9] by advertising on Craigslist.[10] He would arrange for potential buyers to meet with [Bryan] to complete the transaction. Assuming they negotiated a high enough price, [Bryan] would pay Solorzano a commission on the sale of approximately $100 per pound. On average, buyers purchased around five pounds of marijuana from [Bryan].

A couple of days prior to the murders, Hepburn-Martin contacted Solorzano through Craigslist, and they arranged to meet at a restaurant in San Jose on the evening of September 23, 2014. The restaurant was across the street from [Bryan]'s home. Hepburn-Martin told Solorzano he owned a marijuana dispensary in Walnut Creek, and he was interested in purchasing five pounds of "Girl Scout Cookies"[11] for $10,000. Solorzano expected that he would make a

---

[8] Except as otherwise noted, the factual recitation is taken from this court's prior opinion from the orders denying the petitions for resentencing, *Hepburn-Martin, supra,* H049531, H049539 [nonpub. opn.]. Empty brackets [ ] denote deletions from the prior opinion. Brackets enclosing material (other than parallel citations) denote insertions or additions by this court, unless otherwise specified. We include additional facts presented at trial and related to the issues presented on appeal in connection with our discussion of those issues below.

[9] The prior opinion refers to Keith Lang as "Keith" and to Bryan Lang as "Lang." To avoid any confusion, we have substituted Bryan's name in brackets where appropriate in the factual recitation section and refer to members of the Lang family by their first names in the remainder of this opinion.

[10] "Solorzano initially invoked his Fifth Amendment right against self-incrimination but testified after being granted use immunity."

[11] "This referred to a specific strain of marijuana."

$1,000 commission on the deal at that price. Although Solorzano told Hepburn-Martin that he had the Girl Scout Cookies strain available, he knew that [Bryan] actually had a different strain of marijuana.

Solorzano met Hepburn-Martin in the restaurant's parking lot and walked with him across the street to [Bryan]'s house. [Bryan] met them at the front door and the three men went to his bedroom. [Bryan]'s fiancée, Lisa Luna, was in the room working on her computer.

[Bryan] brought out some samples of the marijuana, but Hepburn-Martin did not like them and asked if [Bryan] had anything else. [Bryan] left the room and returned with three or four more samples. Hepburn-Martin said he needed to show the samples to his associates.[12] Solorzano and Hepburn-Martin went outside and walked across the street carrying a small amount of marijuana to show to Hepburn-Martin's associates, Cornejo and Richard, who were waiting on the sidewalk. Cornejo indicated that they would take the marijuana even though they did not "love [the quality]." Solorzano and Hepburn-Martin[13] walked back toward [Bryan]'s house. [Bryan] was standing outside and Hepburn-Martin asked if it was all right if Cornejo and Richard came inside as well. [Bryan] agreed, and all five men went back to [Bryan]'s bedroom. All of the bags of marijuana were on the bed and [Bryan] said " 'Let's see the money.' " Either Cornejo or Richard

---

[12] "According to Solorzano, when he met Hepburn-Martin in the parking lot, Hepburn-Martin mentioned he had brought two friends with him who were waiting in his car."

[13] During trial, Solorzano testified that he walked back to the house that night with Hepburn-Martin even though he acknowledged, after viewing the security footage from outside Bryan's house, that the person he walked back with was wearing somewhat different clothing than that worn by Hepburn-Martin. When Solorzano resumed his testimony the following day, he corrected his testimony and said that he walked back to Bryan's house with Cornejo, not Hepburn-Martin.

handed a backpack to Hepburn-Martin, who reached inside and pulled out a black semiautomatic pistol.  Hepburn-Martin pointed the weapon at [Bryan] and said, " 'Give me all the weed.' "[14]

[Bryan] said, "Ah, shit," and tried to twist the gun out of Hepburn-Martin's grasp.  Solorzano said they struggled for 10 to 20 seconds before he heard a gunshot.  Solorzano had his hands up, saying " 'Don't shoot me.' "  Someone pistol-whipped Solorzano in the face, and he believed it was Hepburn-Martin since he was the only person Solorzano saw with a gun that night.  Solorzano fell to the ground and someone wearing boots stomped on his face.  Afterward, he saw one or two people running out carrying bags of marijuana.

Solorzano saw Luna grabbing at [Bryan] and looking at his gunshot wound.  She asked " 'What do I do' " and Solorzano told her to call the police.  Luna had a mark on her face and Solorzano believed she had been pistol whipped as well.  Solorzano left the house and met with his friends at a nearby pizzeria, then took a taxi to his friend's house.  He put some ice on his face and spent a couple of hours watching television and checking Facebook.

### b. Lisa Luna's testimony

Luna had been dating [Bryan] for seven years and frequently stayed at his house, though she did not live there.  On September 23, 2014, she was in [Bryan]'s bedroom transferring photos from her phone onto her computer.  She was not fully paying attention but heard [Bryan] talking to someone on the phone.  At some point, Luna became aware that three or four other people had entered the bedroom with [Bryan] though she was not focused on what the men were saying.

---

[14] "On cross-examination, Solorzano admitted that he had never previously told anyone, including police officers, that Hepburn-Martin made this demand on the night of the shooting.  Solorzano further admitted that he 'made up this … story of robbery, because it removes [him] from the situation.' "

When the tone of the conversation changed, Luna looked up from her computer. She saw the men were looking at marijuana on the bed and "they weren't happy with the way it smelled or something." Luna paid special attention to one man, whom she later identified as Cornejo, who was giving [Bryan] "a tone attitude."

[Bryan] sounded uncomfortable and said he did not understand why Cornejo was upset because he never claimed the marijuana "smelled a certain way." The other men in the room left, leaving [Bryan] and Luna alone in the bedroom. Luna heard [Bryan], apparently looking at the monitor displaying the feeds for the security cameras outside the house, say " 'Why aren't they leaving? They're still here. ... They're coming back.' " Luna saw [Bryan] leave his bedroom for about 30 seconds, but then he came back in followed by Cornejo. [Bryan] was walking backwards with his hands up, as if trying to push Cornejo out of the room or to push Cornejo's arms away from him. Luna saw that Cornejo was pointing a gun at [Bryan].

Luna heard a gunshot as Cornejo fired his weapon and she saw [Bryan]'s arms drop. Immediately after that shot, Luna was hit in the back of the head but she did not know who or what hit her.[15] Luna said that she was not aware anyone other than Cornejo and [Bryan] were in the room with her. At the same time as she was hit in the head, Luna heard a second gunshot and thought perhaps she had been shot. She could only hear "faintly" and there was ringing in her ears. Luna fell to floor between the desk and the dresser. While on the ground, she heard three or four more gunshots.

---

[15] "Luna was transported to the hospital by ambulance after the shooting for treatment of her head wound, which was 'open and bleeding.' "

9

After her ears stopped ringing, Luna rolled over and saw Solorzano[16] standing by the bedroom door.  Solorzano had blood all over his face and "looked like he was shocked."  She then saw [Bryan] on his hands and knees, fighting to breathe.  [Bryan] then collapsed onto his stomach.  Luna looked at Solorzano because she was not sure who he was or what he planned to do, but he just left the room.  Luna crawled over to [Bryan], rolled him onto his back, and tried to perform CPR.  She called 911 and spoke to the dispatcher while trying to continue CPR.  When she heard sirens, she went outside to direct first responders to [Bryan]'s bedroom.

In the hallway outside [Bryan]'s bedroom, Luna could hear [Bryan]'s mother, Diane, who was also on the phone with 911.  Luna heard Diane tell the dispatcher that her husband had been shot and her son "was on the ground."

At the time of the shooting, Luna was not aware anyone else was in the room besides herself, [Bryan], and Cornejo.  Cornejo was the only person that Luna saw with a gun that night.  Cornejo's gun was chrome, and approximately seven to eight inches in length.  In all, she heard four to five shots fired, but only saw Cornejo fire the first shot.  Luna knew that [Bryan] owned a chrome revolver at some point, which he kept on top of a piece of furniture near the front door out of sight.  Luna did not know if he still owned that gun on the day of the shooting and denied seeing it near him when she was attending to him.

### c. Diane Lang's testimony

On September 23, 2014, Diane, [Bryan]'s mother, was in her bedroom watching television with her husband, Keith, who had fallen asleep.  She heard a thump.  At first, she continued to watch television, but when she heard a second

---

[16] "Luna testified she did not know Solorzano and had never seen him prior to that day."

10

thump, she turned the volume down and listened.  Diane heard a third thump so she muted the television and went to [Bryan]'s bedroom door but did not hear anything.  She tried to open the door, but it would not open, even though it had no lock.  Diane threw herself at the door with her shoulder and the door flew open.

Inside, Diane saw a light-skinned Black man with a thin face, thin nose, and average build, approximately 5 foot 11 inches tall, holding a gun pointed at the floor.  The man, whom Diane identified as Cornejo, looked straight at her.  Diane described the gun Cornejo was holding as a black semiautomatic handgun approximately seven to eight inches in length.  She glanced toward the bed but did not see [Bryan] or Luna.  Diane slammed the door shut and ran toward her bedroom, screaming at her husband, " 'He has a gun.  Get up.  He's got a gun.  Get your gun.' "

Diane ducked into the hallway bathroom and jumped into the bathtub but realized she had no way to escape if Cornejo followed her.  She left the bathroom and headed toward her bedroom again.  She saw Keith in the doorway to the bedroom and heard a gunshot.  Diane started to duck and kept running when she heard a second shot, saw a flash, and some plates on her dresser shattered.  She ran around Keith and jumped into the bedroom closet.

Diane heard a third gunshot and came out of her bedroom.  The front door to her house was open, and Keith was lying face down on the bathroom threshold.  Diane called his name, but he did not respond.  She ran to the kitchen to call the police and saw Luna and [Bryan] on the floor of his bedroom.[17]  Luna was trying to breathe into [Bryan]'s mouth.  Diane called 911 and then ran back to Keith, but

---

[17] "After appellants fled her home, Diane returned to [Bryan]'s bedroom and saw him lying in the spot where she had previously seen Cornejo standing with his weapon pointed at the floor."

she could not tell if he was still breathing. She passed [Bryan], and saw he was turning gray, and heard Luna talking to 911 as well.

Diane heard a total of three gunshots in the house, and believed she heard two more gunshots outside, after she saw Keith lying on the floor. Before she originally came out from her bedroom to investigate the noises, she heard three thumps, all of which sounded like they came from [Bryan]'s bedroom.

### d. Police investigation

In gathering evidence at the scene, police discovered a fully loaded .357-caliber revolver beneath [Bryan]'s body. Police also found a fully loaded black .38-caliber revolver on the floor next to Keith's leg. Neither of these weapons had been fired and no other guns were found in the house.

Inside the home, police found a total of six shell casings and three spent projectiles. Five of the six recovered shell casings were found in [Bryan]'s room. Two of these casings were .380-caliber and three casings were .45-caliber. The sixth shell casing, also .45-caliber, was found on the living room floor directly across from [Bryan]'s bedroom.

One spent projectile, a .45-caliber bullet, was lodged in the wall behind [Bryan]'s bedroom door, approximately two feet above the floor. A second spent .45-caliber bullet was on the dresser in Diane's bedroom. That bullet had drywall material on it, and there was a strike mark on the wall of the hallway, which indicated the bullet ricocheted off that wall before continuing into the bedroom and landing on the dresser. The third spent projectile, also .45-caliber, was found underneath Keith's body. There was a bullet strike mark on the shower tile at a height of 4 feet 3 inches above the floor. Based on the strike mark and Keith's wounds, the bullet hit Keith in the chest, exited through his back, then struck the shower tile before falling to the floor. Two other projectiles, a [nominal] .38-

12

caliber copper jacket[18] and a .45-caliber bullet, were recovered from [Bryan]'s body.

The two .45-caliber casings recovered from the threshold of [Bryan]'s bedroom and from the living room were consistent with the shooter firing down the hallway toward the bathroom and Diane's bedroom.

According to a ballistics and firearms expert, the four .45-caliber shell casings found in the [Bryan] home were all fired from the same (.45-caliber) firearm and the two .380-caliber shell casings were fired from the same (.380-caliber) firearm. If the .45-caliber spent projectiles recovered at the scene were fired from the same firearm as the .45-caliber shell casings, the expert testified that the weapon used was a Glock .45 automatic [] pistol. The expert also opined that if the [nominal] .38-caliber projectile found at the scene was fired from the same firearm as the .380-caliber shell casings, the firearm used was a .380 semiautomatic pistol.

Police found approximately 17 pounds of marijuana inside the house—7.5 pounds in [Bryan]'s room, and approximately 10 pounds in both the family room and living room. More marijuana was found in a drying room, and there were approximately 15 marijuana plants growing in the backyard.

### e. Autopsy evidence

[Bryan] was shot three times from a distance of at least two to three feet and the cause of death was "multiple gunshot wounds." One .45-caliber bullet hit [Bryan] in the upper back, caused trauma to his spine, lacerated his aorta and the

---

[18] The firearms expert explained that the "nominal caliber of the fired jacketing simply refers to a family of cartridges it could have come from." Due to the damage to this projectile, he was not able to specify its caliber as it "could have come from a .380 auto bullet, could have come from a .38 special bullet, could have come from a .357 bullet, 9-millimeter Luger, [or] 9-millimeter short."

left ventricle of his heart, traversed part of his left lung, then exited through the lower left side of his chest. Based on the bullet's trajectory and the fact that it was found lodged in the wall two feet above the floor, it appeared that [Bryan] was either bent over or on his knees when the shot was fired. Due to the severity of the damage to [Bryan]'s heart, he would have collapsed and died soon after being hit by this bullet.

A second .45-caliber bullet struck [Bryan] in his lower back on the right side, hitting his spine, his left adrenal gland, and left kidney before lodging in his lower left abdomen. The trajectory of this bullet was nearly horizontal from right to left and back to front. While the injuries from this shot were serious, they were not necessarily fatal. Due to the fact that more blood had pooled in [Bryan]'s chest cavity than in his abdomen, it appeared that the shot which entered his upper back preceded the shot that entered his lower back. Based on the trajectories of both bullets, the shooter would have been positioned to [Bryan]'s right.

The third bullet, a [nominal] .38-caliber, entered the left side of [Bryan]'s left thigh traveling from left to right. The bullet fragmented on the way, but it did not hit [Bryan]'s femur or major blood vessels and would not have been fatal in and of itself. Based on the trajectory, it was likely that the shooter was positioned on [Bryan]'s left side when he fired, but it was possible that, if the other two shots preceded this one, [Bryan] might have spun around.

[Bryan] also had two injuries, consistent with being struck by a firearm, on the top of his head. [Bryan]'s scalp was lacerated and his skull was superficially fractured which indicated that significant force was used. The blows could have caused [Bryan] to collapse, become dazed or even concussed.

Keith was shot at least once, but not at close range, and the cause of death was determined to be "perforating … gunshot wound of the chest." The first

14

injury was a bullet graze on his right hand. The second injury was where a bullet entered the left side of Keith's chest and went through his left lung, his aorta, and his right lung before exiting his right back. The trajectory of the bullet was front to back, left to right, and slightly upward. Although the injuries to Keith's aorta and lungs were fatal, he might have been able to take some steps before collapsing from blood loss. The bullet strike on the shower tile four feet three inches from the floor suggested Keith was standing when he was shot and the bullet hit the tile after exiting his body. It was possible that both the graze wound and the chest wound were caused by the same bullet, hitting Keith's hand first before continuing into his chest. Keith also had abrasions on his right knee and left forehead, which were consistent with him falling to the floor after being shot.

### 2. Defense case

[Bryan]'s brother, David, testified in codefendant Richard's case. On September 23, 2014, David was living at his parents' house and he arrived home from work between 5:00 and 6:00 p.m. Diane, Keith, [Bryan], and Luna were all at home when he got there. After taking a shower and changing his clothes, David left the house around 8:00 or 9:00 p.m. As he was leaving, David saw four or five men standing near the front gate. [Bryan] was standing by the front door and seemed a little nervous. David asked [Bryan], " 'Is everything okay?' " and whether he wanted David to stay because " '[t]hese guys are kind of fishy.' " [Bryan] patted his hip and said he had things " 'under control.' " David saw that [Bryan] had a .357 revolver tucked into his waistband. David assumed the men by the gate were there to buy marijuana from [Bryan].

Officer Rick Yu testified that, in 2005, he pulled [Bryan] over for a traffic violation involving tinted windows. While Yu was writing the traffic citation, [Bryan] got upset and said, " 'You're just a punk-ass Chinaman cop. Without that

15

badge you ain't shit.' " [Bryan] signed the citation and then said, " 'You [*sic*] punk-ass motherfuckers like you are the ones that need to get killed and shit. We'll meet again, motherfucker.' " As he said this, [Bryan] made a gesture with his hand that simulated a gun shooting Yu. Yu arrested [Bryan] for threatening a police officer and on the way to jail, [Bryan] said, " 'Everyday someone dies. Their family member gets killed and shit.' "

### 3. *Final arguments and jury instructions*

After the close of evidence, the prosecutor argued that both Cornejo and Hepburn-Martin, as well as codefendant Richard, were guilty of first degree felony murder of both [Bryan] and Keith as direct perpetrators or aiders and abettors. The prosecutor also argued that the defendants could be found guilty of (1) second degree malice murder of both [Bryan] and Keith as direct perpetrators or aiders and abettors, and (2) the second degree murder of Keith under the natural and probable consequences theory as either direct perpetrators or aiders and abettors of the second degree murder of [Bryan].

The jury was instructed that it could find Cornejo and Hepburn-Martin guilty of Keith's murder under one of four theories: (1) as the actual killer; (2) as a direct aider and abettor; (3) as an aider and abettor under the natural and probable consequences doctrine; or (4) under the first degree felony murder rule. The jury found both Cornejo and Hepburn-Martin guilty of the second degree murder of both [Bryan] and Keith.

## II. DISCUSSION

### A. *Request for judicial notice*

Hepburn-Martin sought to augment the record on appeal with the signed version of the trial court's 2021 memorandum order denying the petitions for

16

resentencing.[19]  By separate order dated July 19, 2024, this Court deemed the motion to augment the record on appeal as a request to take judicial notice and deferred ruling on the request until consideration of the merits of this appeal.

The Attorney General opposes the request for judicial notice on the grounds that: (1) the superior court lacked jurisdiction to sign this memorandum order after remittitur issued on the appeal challenging that order (H049531); (2) "the unsigned decision is already part of the record, and the signed copy adds nothing because the decision remains a product of the court's prehearing views"; and (3) the memorandum order, prepared in 2021, is not relevant to evaluating whether the trial court erred in denying the 2018 motion for new trial.

The signed, filed-stamped order is a proper subject of judicial notice (Evid. Code, § 452, subd. (d)), but we only take judicial notice of relevant materials. (See *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2 ["any matter to be judicially noticed must be relevant to a material issue"].)

The trial court's unsigned memorandum order is already part of the record in this appeal.  By order dated September 12, 2024, this court granted Hepburn-Martin's request to take judicial notice of the record, which included that 2021 unsigned order, in the appeal from the denial of his petition for resentencing (H049531).  Hepburn-Martin does not explain how the signed, filed-stamped order is of any assistance in resolving the issues presented in this appeal.  He does not indicate how, if at all, the *content* of those two documents differs and, if so, what impact those differences would have on our analysis.  We deny the request to take judicial notice of the 2024 signed, filed-stamped order because it is duplicative of something already in the record on appeal and not relevant.

---

[19] The document indicates that it was signed on June 24, 2024, and bears a filed-stamped date of June 25, 2024.

17

### B. Instructional error: aiding and abetting

Hepburn-Martin and Cornejo argue that the trial court failed to appropriately instruct the jury that, in order to find them guilty of implied malice murder as aiders and abettors, the jury must find that they personally acted with malice. The Attorney General concedes that the trial court's instruction was insufficient but argues that the error was harmless.

As discussed below, we agree that the jury was not properly instructed that, to be convicted of second degree murder, an aider and abettor must have *personally acted* with malice. (See *People v. Langi* (2022) 73 Cal.App.5th 972, 982 (*Langi*) [the previous standard jury instructions on aider and abettor liability "create[] an ambiguity under which the jury may find the defendant guilty of aiding and abetting second degree murder without finding that he personally acted with malice"].) We also conclude that the Attorney General has failed to show that the error was not harmless beyond a reasonable doubt as required under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

#### 1. Additional background

##### a. Evidence of appellants' mental state

At trial, Luna testified that, just before the shooting, she saw Bryan struggling with Cornejo, trying to push Cornejo's gun away so it was not pointing at him. Luna then heard a gunshot. Diane testified that, when she burst into Bryan's bedroom, she saw Cornejo standing there holding a gun.

However, Solorzano testified that *Hepburn-Martin* was the person who shot Bryan as Bryan tried to wrestle Hepburn-Martin's gun away from him. Solorzano admitted lying to the police when he was initially interviewed about the shootings, but claimed that he began "telling them [i.e., the police] the truth" when the officer pointed out that he could be prosecuted.

18

### b. Jury instructions on aiding and abetting

Prior to deliberations, the trial court instructed the jury with CALCRIM Nos. 400, 401, and 520. As given, CALCRIM No. 400 stated: "A person may be guilty of a crime in two ways. One, he may have directly committed the crime. I will call that person the perpetrator. Two, he may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he committed it personally or aided and abetted the perpetrator. [¶] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."

CALCRIM No. 401 instructed the jury that: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at

19

the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

Finally, CALCRIM No. 520, in pertinent part, provided that: "To prove that a defendant is guilty of second degree murder, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought; AND [¶] 3. He killed without lawful justification. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. [¶] The defendant acted with implied malice if: [¶] 1. He intentionally committed an act; [¶] 2. The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; AND [¶] 4. He deliberately acted with conscious disregard for human life."

In his rebuttal argument,[20] the prosecutor advanced two theories of second degree murder liability: (1) direct aiding and abetting "where you have the defendant with the .380 and the defendant with the .45 and the third defendant aiding and abetting each other in the second degree murder of Bryan Lang[,]" and (2) indirect liability for the natural and probable consequences of the "murder of Keith Lang and the pistol-whipping, [section] 245, and the one for David[21] Lang, are they a natural and probable consequence of violence to Bryan Lang in the bedroom? Is it reasonably foreseeable that if you're going to murder somebody in

---

[20] The prosecutor's closing argument was focused on convincing the jury to find appellants guilty of first degree murder under a felony murder theory. However, the prosecutor indicated he would respond in rebuttal, if appellants sought to "explain why [they] are only guilty of second degree[]murder."

[21] David was not one of the victims, so we presume the prosecutor meant to say "Diane Lang," the alleged victim in count 5, instead.

the bedroom, people around might see that, might get -- the violence may spread to them, that the defendants might want to hurt them to deter them from calling for help or from interfering?  And is it reasonably foreseeable that somebody in the house might come to their son's aid and get caught in the cross fire [*sic*]."

### *2. Applicable law and standard of review*

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review."  (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)  When we review a purportedly erroneous instruction, we consider " ' " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  [Citation.]' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1028 (*Richardson*).)  We consider the instructions as a whole and " 'assume that jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*Ibid.*)

If a trial court incorrectly instructs on an element of a charged offense such that the error impermissibly shifted or lowered the burden of proof for that element, the applicable standard of prejudice is the *Chapman* standard.  (See *Rose v. Clark* (1986) 478 U.S. 570, 570–581.)  Under the *Chapman* standard, a federal constitutional error requires reversal unless the People show the error was "harmless beyond a reasonable doubt."  (*Chapman*, *supra*, 386 U.S. at p. 24.)

In the case of *In re Lopez* (2023) 14 Cal.5th 562 (*Lopez*), the California Supreme Court further clarified the standard for evaluating harmless error arising from an instruction based on an invalid theory or with omitted required elements. Specifically in *Lopez*, the California Supreme Court stated that for the error to be harmless, the state must show "it would be impossible, based on the evidence, for a jury to make the findings reflected in its verdict without also making the findings

21

that would support a valid theory of liability." (*Lopez*, *supra*, at p. 568.) "[W]hile 'overwhelming' evidence may demonstrate harmlessness, a court's analysis of whether the evidence is 'overwhelming' in this context is not as subjective or free-ranging as that term might imply. Instead, the analysis requires a court to rigorously review the evidence to determine whether any rational juror who found the defendant guilty based on an invalid theory, and made the factual findings reflected in the jury's verdict, would necessarily have found the defendant guilty based on a valid theory as well. [Citation.]" (*Ibid*) "The question here is not the sufficiency of the evidence to support a valid theory, but its opposite." (*Id.* at p. 591.)

"We do not focus exclusively on the evidence favorable to the verdict, and we do not presume the existence of any facts the jury might reasonably infer in favor of the prosecution." (*People v. Madrigal* (2023) 93 Cal.App.5th 219, 243 (*Madrigal*), citing *People v. Mil* (2012) 53 Cal.4th 400 (*Mil*).) "We do not view the evidence in the light most favorable to the prosecution. We review the evidence in the light most favorable to the defendant, and in doing so, we do not reweigh the evidence or resolve evidentiary conflicts. [Citations.]" (*Madrigal*, at p. 243.) "The testimony of a single witness may be sufficient—even if there is significant countervailing evidence, and the testimony is subject to justifiable suspicion." (*People v. Valenti* (2016) 243 Cal.App.4th 1140, 1167 (*Valenti*), citing *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) "If a thorough review of the record shows there is any evidence that a rational juror could find as a basis for reasonable doubt as to any erroneously omitted element, then the error requires reversal, even when there is 'ample evidence' to support a finding of guilt." (*Madrigal, supra*, 93 Cal.App.5th at p. 243, citing *Valenti, supra*, 243 Cal.App.4th at p. 1166.)

22

"Second degree murder is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Malice may be either express, i.e., when a defendant manifests an intention to kill, or implied. [Citation.] " 'Malice is implied when the killing is proximately caused by ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life." ' " ' [Citation.] Thus, implied malice includes an objective component—an act that is dangerous to life—and a subjective component—the defendant's awareness of and disregard for the danger." (*Clements, supra*, 75 Cal.App.5th at p. 299.) Intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Smith* (2005) 37 Cal.4th 733, 741.)

A person can be convicted of aiding and abetting second degree murder based on implied malice. (*People v. Reyes* (2023) 14 Cal.5th 981, 990 (*Reyes*); *People v. Gentile* (2020) 10 Cal.5th 830, 850 [" '[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life' "].)

"In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering

23

act, not the result of that act.  The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life.'  [Citation.]"  (*Reyes, supra*, 14 Cal.5th at p. 991.)

### 3. Analysis

In this case, like in *Langi*, *supra*, 73 Cal.App.5th 972, the jury instructions failed to apprise the jury that "to be guilty as a direct aider and abettor of second degree murder, an accomplice must have acted with the mental state of implied malice. …"  (*Id*. at p. 983.)[22]  The Attorney General acknowledges that the instructions "did not expressly make this point," but instead argues "the omission was harmless beyond a reasonable doubt."  We conclude that failure to provide the proper instruction was error and therefore turn to whether the Attorney General has demonstrated, beyond a reasonable doubt, that the error was harmless.

In *People v. Merritt* (2017) 2 Cal.5th 819, the California Supreme Court discussed circumstances an appellate court may consider in analyzing whether the failure to instruct on an element of the offense was harmless error.  (*Merritt*, *supra*, at pp. 831–832.)  For example, was the missing element "accurately described" to the jury by "both parties"?  (*Id*. at p. 831.)  Did the defendant concede or admit the missing element?  (*Ibid*.)  Was " 'the omitted element … uncontested and supported by overwhelming evidence, …' [Citation.]"?  (*Id*.

---

[22] In 2023, the Judicial Council added to the pattern instructions CALCRIM No. 526 (Implied Malice Murder: Aiding and Abetting), which makes clear that an aider and abettor must personally harbor implied malice.  (Jud. Council of Cal., Criminal Jury Instructions: Revisions and Additions, Invitation to Comment, Comments submitted by June 30, 2023, pp. 50-54.; CALCRIM No. 526.)

at p. 832.)  Finally, does "what the jury, properly instructed, necessarily found support[] the conclusion that the error did not contribute to the verdict"?  (*Ibid*.)

None of the circumstances discussed in *Merritt* can be said to apply here. Neither the prosecutor nor any of the defense attorneys told the jury that it had to find that Hepburn-Martin and Cornejo *personally* acted with malice before either could be individually convicted as aiders and abettors to the murders of Bryan and Keith.  In fact, the prosecutor's argument was that appellants could be convicted of murder based entirely on their participation in the drug transaction, regardless of whether the killings were intentional or accidental.

In discussing the theory of aiding and abetting, the prosecutor explained that the only intent that mattered was that appellants "intend[ed] to help the person do the crime."  At oral argument, the Attorney General indicated that  "the crime" at issue was the "life endangering act" of the direct perpetrator shooting the .45-caliber firearm at both Bryan and Keith, and thus it was irrelevant that the jury did not know who used which weapon.  We disagree that the jury would parse the instructions to substitute the concept of "life endangering act" (as discussed in CACLRIM No. 520) in place of "the crime" (as discussed in CALCRIM No. 401). This is especially so because the appellants were charged with having committed the murders during a robbery or burglary, meaning that the jury would certainly read "the crime" in CALCRIM No. 401 as referencing robbery or burglary,[23] not

---

[23] In closing argument, the district attorney expressly told the jury that he was "going to focus on the instructions that I think apply to this case, and that's the felony murder with the underlying felonies being burglary and robbery.  [¶] Specifically, I'm going to focus on instructions [CALCRIM Nos.] 540A and 540B, which the Court read to you.  I'm not going to spend my time right now talking about second-degree murder."  He also subsequently told the jurors "you don't have to decide who ultimately shot and killed the two victims under this scenario when you have this underlying robbery ….  As long as all three are guilty of the robbery, any shooting, whether you did it yourself or whether a coparticipant did it, you're good for that killing, and that's first-degree felony

25

the amorphous concept of a "life endangering act" described in CALCRIM No. 520. In any event, the People have the burden to show beyond a reasonable doubt that the failure to instruct was harmless and we see no reason to think the jury read CALCRIM Nos. 401 and 520 in the way the People suggest.

In addition, appellants never admitted or conceded that they aided and abetted the fatal shootings of Bryan and Keith, nor did they admit that they personally acted with malice that night. For his part, Cornejo's attorney argued that he shot Bryan, in the leg, in self-defense and, as he was not armed with the .45 caliber firearm, was not responsible for fatally shooting Keith. However, the jury was instructed that, "In their … closing arguments, the attorneys discuss the case, *but their remarks are not evidence*." (Italics added.) The evidence presented at trial was conflicting as to whether it was Hepburn-Martin or Cornejo that shot Bryan in the leg with the .380-caliber as he fought for control of that weapon.

As another consideration, the trial record does not reflect uncontested evidence supported by overwhelming evidence that Hepburn-Martin or Cornejo individually harbored malice to support a second degree murder conviction under an aiding and abetting theory. As discussed above, Bryan and Keith were both fatally shot by a .45 caliber weapon. Luna testified at trial that Bryan was struggling with Cornejo, trying to keep the gun from being aimed at him, when she heard a gunshot. Diane, after coming into Bryan's room, also identified Cornejo as the only person she saw with a firearm. However, Solorzano testified that

---

murder." Finally, just before concluding his argument, the district attorney told the jury, "The defense [in their closing arguments] did not articulate a second-degree murder theory to you. But if there was one that they were going to articulate, it would probably be found in CALCRIM [Nos.] 401 and 402 where you have—it's the aiding and abetting scenario where you have the defendant with the .380 and the defendant with the .45 and the third defendant aiding and abetting each other in the second-degree murder of Bryan Lang."

26

*Hepburn-Martin* was the person who shot Bryan as Bryan tried to wrestle Hepburn-Martin's gun away from him. Solorzano also testified that Hepburn-Martin was the only person he saw with a gun. The only gunshot wound on the front of Bryan's body was from the .380 caliber firearm.[24] During closing argument, however, after the prosecutor conceded that he could not prove which defendant was carrying the .45 caliber firearm, he argued that it did not matter since the jury could still find appellants guilty of murder under the felony murder theory or as aiders and abettors. Such a concession by the prosecutor, at a minimum, reflects that the evidence when presented to the jury left unresolved the question of whether it was Hepburn-Martin or Cornejo who fired the fatal shot from the .45 caliber firearm resulting in Bryan's death.

Similarly, the evidence regarding whether either appellant acted with malice when Keith was shot was not overwhelming. Appellants entered Bryan's bedroom, presumably to purchase marijuana as agreed beforehand. There was no evidence that appellants knew anyone other than Solorzano, Bryan, and Luna were present in the house. Once Bryan had been shot, Diane burst into the room, saw Cornejo[25] holding a gun and ran down the hall. As she ran, Diane called out to Keith, who had been asleep, that someone was in the house with a gun, and Keith should get his gun. As Keith entered the hallway, apparently with his gun out, he was shot and killed by whoever was carrying the .45 caliber firearm. This

---

[24] As mentioned earlier, Cornejo's counsel stated in closing argument that Cornejo was the person who was armed with and used the .380 caliber firearm on the night of the shooting. This, by itself, is not dispositive. "Unsworn statements of counsel are not evidence because unsworn testimony in general does not constitute 'evidence' within the meaning of the Evidence Code. [Citation.]" (*People v. Kiney* (2007) 151 Cal.App.4th 807, 815.)

[25] Again, Solorzano testified that Hepburn-Martin shot Bryan as they fought over the gun.

evidence, at most, gives rise to an inference that appellants knew they might be confronted by someone who was also armed as they tried to flee the house, but this is not overwhelming, uncontroverted evidence that whoever was *not* armed with the .45 caliber personally acted with malice in aiding and abetting Keith's shooting.

It also cannot be said that the jury's findings on the firearm enhancement for count 1, pursuant to section 12022.53, subdivision (d), necessarily support a finding that Hepburn-Martin and Cornejo harbored the necessary malice to be convicted of second degree murder as aiders and abettors. Such a finding does not establish which person used the .45 caliber weapon and it is also consistent with a conclusion that *either* Hepburn-Martin or Cornejo fired the non-fatal shot from the .380 caliber firearm into Bryan's leg causing great bodily injury *or* death. Therefore, the jury's verdicts on that enhancement do not "support[] the conclusion the [instructional] error [on aiding and abetting liability] did not contribute to the verdict." (*Merritt*, *supra*, 2 Cal.5th at p. 832.)

"If a thorough review of the record shows there is any evidence that a rational juror could find as a basis for reasonable doubt as to any erroneously omitted element, then the error requires reversal, even when there is 'ample evidence' to support a finding of guilt." (*Madrigal, supra*, 93 Cal.App.5th at p. 243, citing *Valenti, supra*, 243 Cal.App.4th at p. 1166.) While some of the evidence presented at trial could have hypothetically supported a finding of implied malice, there was also ample evidence "that a rational juror could find as a basis for reasonable doubt" (*Madrigal, supra*, at p. 243) as to the omitted element that appellants must have personally acted with malice to be found guilty as aiders and abettors. Consequently, we find that the Attorney General has failed to show

beyond a reasonable doubt that the instructional error was not harmless as to counts 1 and 2.[26]

### C. Motion for new trial

Hepburn-Martin argues that the trial court employed the incorrect standard in denying his motion for a new trial on the ground that the jury's verdicts were contrary to the evidence pursuant to section 1181, subdivision 6.[27]  The Attorney General counters that the trial court, in fact, applied the correct standard and did not err in denying the motion.  Because we will order a possible new trial for count 1 and count 2 for the previously discussed reasons, we address Hepburn-Martin's claim of error to the extent it would apply to his remaining convictions for count 3 and count 4.

---

[26] Because we have concluded that appellants are entitled to reversal of their convictions on counts 1 and 2 due to the instructional error discussed above, we need not reach their joint argument that they are entitled to reversal of their convictions on these counts because the jury was also instructed on the since-invalidated natural and probable consequences theory of liability.  We also need not reach their joint argument that they are entitled to resentencing on the firearm enhancement associated with their conviction on count 1, or Hepburn-Martin's separate arguments that his convictions on counts 1 and 2 must be reversed because: (1) there was instructional error on the felony murder theory of liability; and (2) the cumulative effect of the instructional errors deprived him a fair trial.  To the extent Hepburn-Martin or Cornejo claim that either of the aforementioned errors also require reversal of their convictions on count 3 and count 4, we need not and do not consider such claims.  No definitive arguments have been made as to those counts and an appellant is required to supply the reviewing court with a cogent argument which is supported by citations to the record.  We will disregard conclusory arguments not supported by relevant legal authority.  (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287; Cal. Rules of Court, rule 8.204(a)(1)(B).)

[27] Cornejo also brought a motion for new trial, but he does not join in Hepburn-Martin's argument or separately argue that his motion was improperly denied.

29

### 1. Additional background

Following appellants' convictions, Hepburn-Martin moved for a new trial, arguing, among other things, that the verdicts were contrary to the law or evidence under section 1181, subdivision 6.  While that motion was pending, appellants petitioned for resentencing under section 1172.6.

The court conducted two hearings on Hepburn-Martin's motion for new trial in March and April 2018.  Just prior to submitting the matter, Hepburn-Martin's counsel discussed the standard of review that applies to his motion, explaining that "as the thirteenth juror, if the Court disagrees with the jury's verdict, if it believes that the verdict was contrary to the law or evidence ... the Court actually extends no evidentiary deference to the jury's verdict.  [¶] … [T]he defendants are entitled to an independent evaluation from the Court."

The trial court denied Hepburn-Martin's motion for a new trial.  In explaining its ruling, the court acknowledged that it "struggle[d] with this because there is a lot about the prosecution's testimony that I don't believe, and obviously the jury didn't believe a lot of it either.  However, the jury did believe in a … version of the facts that did come into evidence in a manner consistent with the verdict[s].  [¶]  And I—while I respect the decision of the jury for purposes of the 1181 motion, I'm of my own mind that I believe that the evidence does sustain the verdict."

### 2. Applicable legal principles

In determining a new trial motion brought under section 1181, subdivision 6, the trial court accords no evidentiary deference to the verdict.  (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133 (*Porter*).)  "Instead, it independently examines all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge,* who sits, in effect, as a

'13th juror.' " (*Ibid.*)  Thus, the court considers "the proper weight to be accorded to the evidence" and then determines whether "sufficient credible evidence" supports the verdict.  (*People v. Robarge* (1953) 41 Cal.2d 628, 633 (*Robarge*) ["It has been stated that a defendant is entitled to two decisions on the evidence, one by the jury and the other by the court on motion for a new trial"].)  If the court is not convinced that the charges have been proved beyond a reasonable doubt, it may rule that the jury's verdict is " 'contrary to [the] ... evidence' " within the meaning of section 1181, subdivision 6.  (*Porter, supra,* at p. 133.)  In doing so, the judge acts as a 13th juror who is a "holdout" for acquittal.  (*Ibid.*)  Thus, the grant of a new trial is "the equivalent of a mistrial caused by a hung jury."  (*Ibid.*)

In its independent assessment of the evidence, the trial court is guided by a presumption in favor of the correctness of the verdict and the proceedings in its support.  (*People v. Fuiava* (2012) 53 Cal.4th 622, 729 (*Fuiava*) [trial court should not disregard the verdict but instead consider the proper weight to be accorded to the evidence and then decide whether the verdict is supported by sufficient credible evidence].)  The presumption that the verdict is correct, however, does not affect the court's duty to apply its independent determination to the probative value of the evidence.  (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1252.)

The court has broad discretion in ruling on a new trial motion, and the court's ruling will not be overturned absent a clear and unmistakable abuse of that discretion.  (*Fuiava, supra,* 53 Cal.4th 622, 730.)  The court abuses its discretion, however, where it misconceives its duty, applies an incorrect legal standard, or fails to independently consider the weight of the evidence.  (*Robarge, supra,* 41 Cal.2d 628, 634 [trial court erroneously deferred to jury's determination of credibility].)

31

### 3. *Analysis*

The record here reflects that the trial court understood and applied the correct standard in evaluating Hepburn-Martin's motion for new trial. The trial court stated that it was denying the motion, despite reservations about some of the prosecution's evidence, because the "jury did believe in a … version of the facts that did come into evidence in a manner consistent with the verdict[s]." The trial court went on to say that it "respect[s] the decision of the jury for purposes of the 1181 motion, I'm of my own mind that I believe that the evidence does sustain the verdict."

We are not persuaded by Hepburn-Martin's reliance on comments made in *subsequent* proceedings by the trial court expressing its concerns about the quality of some of the evidence presented at trial, particularly Solarzano's testimony and the inability to conclusively state which of the appellants was armed with the .380-caliber firearm and which was armed with the .45-caliber firearm that night. Those comments, made months after the hearing on the motion for new trial, are entirely extraneous to our consideration of whether the trial court applied the proper standard when it denied that motion in April 2018.

In the present case, the trial court did not abuse its discretion in denying the motion. The trial court's statements make clear that it independently assessed the evidence presented at trial and, while it found some of that evidence not credible,[28] "it independently examine[d] all the evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt[.]" (*Porter, supra*, 47 Cal.4th at p. 133.)

---

[28] Since the jury acquitted Richard on all charges and did not convict appellants of first degree murder on a felony murder theory, the jury obviously disbelieved at least some of the prosecution's evidence as well.

### D. Racial Justice Act (RJA)

Appellants argue that their convictions must be vacated because the trial court repeatedly used "racially discriminatory language" throughout the trial proceedings and thereby violated the RJA. The Attorney General counters that the trial court's comments did not violate the RJA or, in the alternative, that any such violation was harmless beyond a reasonable doubt. We agree with the Attorney General and find that appellants have not met their burden of showing, by a preponderance of the evidence, that the trial court's comments violated the RJA. (§ 745, subds. (a).)

#### 1. Additional background

Appellants assert that the trial court used "racially discriminatory language" multiple times during the proceedings, including "unredacted use of the N-word and S-word, comparing appellant[s]'[] language to 'speak[ing] Jive,' comparing Black men with dreadlocks to lions, suggesting that deported persons are liars and thieves, and referencing the defendants' skin tone multiple times." We recount the specific instances below.

#### a. Pretrial in limine motions

While discussing whether a potential defense witness could testify as to a violent encounter with Bryan, the prosecutor mentioned there was "good reason to believe" the witness to that encounter was "quite possibly deported." The trial court remarked, "Deportees are known to have an *animus furandi*. Intent to return." After the court asked itself if it had used the "proper Latin term," it said "Oh, *animus furandi* is intent to steal[,]" and then said, "*Animus revertendi*. That's the term I'm looking for."

The parties discussed the admissibility of various text messages between Hepburn-Martin and others. Certain of these text messages contained the word

33

"nigga" and, during the discussion of these messages, both counsel for Hepburn-Martin and the trial judge quoted from the messages without redacting that word.

In addition, the court addressed the admissibility of a Facebook photo depicting codefendant Richard and two others, neither of whom were appellants, at a shooting range. Hepburn-Martin's counsel opposed admission of the photograph because Hepburn-Martin's and Cornejo's hairstyles were similar to those of the two other men in the photograph and the jury might be implicitly biased against appellants. The court stated that, "The hairstyles are pretty generic. Mr. Donte Clark[29] has long dreads, like half the NFL does these days. [¶] It's kind of a cool look actually. Makes them all look like lions."

Next, the parties discussed the meaning of a phrase, "Where da licks?" in a text message sent by Richard to Hepburn-Martin before the shooting. The prosecution argued that the phrase referred to robbery. The defense argued that a police officer should not be permitted to testify to the meaning of the phrase based on his conversations with other officers and that the court should not take judicial notice of a definition that appears in the Urban Dictionary. The court subsequently expressed that it found it "utterly fascinating that we're spending this much time over words." The court then briefly analogized the discussion to a scene from "the movie *Airplane!* with the black men sick from food poisoning on the plane, and they're complaining to the stewardess. The stewardess can't understand them. And Barbara Billingsley comes up and says 'Stewardess, maybe I can help. I speak Jive.' And she's talking to him—and there's subtitles. You know what I'm talking about; right?" The court then ruled that both parties could present experts to opine on the phrase's meaning.

_____

[29] The trial court was referring to Donté Clark, who was identified by Richard's counsel as a potential expert witness.

34

### b. Conferences during trial, outside jurors' presence

In discussing a text message in which Richard was purportedly trying to dispose of a stolen gun, the prosecutor pointed out that the message was consistent with Solorzano's testimony that, while in Bryan's room, Richard handed Hepburn-Martin the backpack from which Hepburn-Martin produced a gun. The court responded that Solorzano described the person who got the backpack as " 'very dark, very black' " but, in the court's opinion, "all three of [the defendants] are lighter than I am."[30]

During the conference on jury instructions, the court returned to Solorzano's testimony that one of the perpetrators was very dark-skinned and observed, "well, there's no dark-skinned black man present here." Then, during the hearing on the new trial motion, when Hepburn-Martin argued he was not one of the two shooters, the court again referenced Solorzano's description and observed that none of the defendants had very dark skin.

At trial, the parties discussed whether Officer Yu would be permitted to testify about an unrelated prior incident in which Bryan called the officer a "Chinaman." The prosecutor argued that testimony about Bryan's possible prejudice against Asians was not relevant. The court interjected with a description of a television show called *Kung Fu*, which was set in the "Old West." The court indicated that, in the show, when certain persons "refer to a Chinaman [they] would get karate chopped in the neck." After the prosecutor responded that he thought the word was "maybe commonly used" by "our parents and

---

[30] On cross examination, Solorzano confirmed that in describing one of the suspects to a police officer he stated, "And there was another one that was, like, a little wide-ish [*sic*]. He could have been, like, a little Asian. That's why I'm looking for someone like that. And the third one, he was just all black, black, black, black. I'm not trying to be racist or anything."

35

grandparents," the court stated, "Well, yeah, they also used words like 'nigger' and 'spick' and 'hebe' and things like that too."

## 2. Applicable legal principles

In 2020, the Legislature enacted the RJA "with a stated aim 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' (Stats. 2020, ch. 317, § 2, subd. (i).) To that end, the RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin. [Citation.]" (*People v. Wilson* (2024) 16 Cal.5th 874, 945–946.)

Section 745, subdivision (a) enumerates four categories of conduct which, if proven by a preponderance of the evidence, establish a violation of the RJA. (§ 745, subds. (a)(1)–(a)(4).) Section 745, subdivision (a)(2) provides, in relevant part, that a violation has occurred if "[d]uring the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful. This paragraph does not apply if the person speaking is relating language used by another that is relevant to the case or if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (§ 745, subd. (a)(2).) "Racially discriminatory language" is defined as "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the

36

defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin."  (§ 745, subd. (h)(4).)

Where a defendant's claims are based on the trial record, he or she may raise the alleged violation of section 745, subdivision (a) on direct appeal from the conviction or sentence.  (§ 745, subd. (b).)  If a court finds a violation of the RJA, section 745(a), subdivision (e) mandates specific remedies.  Specifically, if a court finds, after entry of judgment, "that a conviction was sought or obtained in violation of subdivision (a), the court shall vacate the conviction and sentence, find that it is legally invalid, and order new proceedings consistent with subdivision (a)."  (§ 745, subd. (e)(2)(A).)  However, "if the court finds that only the sentence was sought, obtained, or imposed in violation of subdivision (a), the court shall vacate the sentence, find that it is legally invalid, and impose a new sentence.  On resentencing, the court shall not impose a new sentence greater than that previously imposed."  (§ 745, subd. (e)(2)(B).)

Section 745 has been amended several times since its enactment.  As originally enacted, section 745 applied prospectively to cases in which judgment had not been entered prior to January 1, 2021.  (§ 745, former subd. (j); Stats. 2020, ch. 317, § 3.)  Under this version of the statute, defendants could raise an alleged violation by filing a motion in the trial court or, if judgment had been entered, by filing either a petition for writ of habeas corpus or a motion under section 1473.7 in a court of competent jurisdiction.  (§ 745, former subd. (b); Stats. 2020, ch. 317, § 3.)  The original statute also mandated various remedies which were specific both to the type of violation found as well as the procedural posture of the case when the violation was established.  (§ 745, former subd. (e); Stats. 2020, ch. 317, § 3.)

Effective January 1, 2023, the Legislature amended section 745 through enactment of Assembly Bill No. 256 (2021–2022 Reg. Sess.). (Stats. 2022, ch. 739, § 2.) Among other changes not relevant to our analysis, this amendment made the statute retroactive "[t]o all cases in which judgment is not final." (§ 745, subd. (j)(1).)

The Legislature amended section 745 a third time through Assembly Bill No. 1118 (2023–2024 Reg. Sess.), effective January 1, 2024. (Stats. 2023, ch. 464, § 1.) This amendment added the following language to subdivision (b) of section 745: "For claims based on the trial record, a defendant may raise a claim alleging a violation of subdivision (a) on direct appeal from the conviction or sentence." As a consequence, "[t]he statute now provides that postjudgment RJA claims based on the trial record may be raised on direct appeal from the conviction or sentence (including to cases with judgments entered before January 1, 2021)." (*People v. Lashon* (2024) 98 Cal.App.5th 804, 810.)[31]

### 3. Analysis

Since the appellants are raising the RJA claims on direct appeal, we are tasked with reviewing the trial court record to determine whether they have established entitlement to relief by a preponderance of the evidence. We conclude several of the examples listed by appellants consisted of the trial court "relating language used by another that is relevant to the case" or were related to certain witnesses "giving a racially neutral and unbiased physical description of the suspect" (§ 745, subd. (a)(2)), both of which are expressly permitted by the RJA. The remaining instances identified by appellants, certain of which could be deemed incautious, have not been shown to consist of language that, "to an

---

[31] The RJA was amended again, effective January 1, 2026 (Stats. 2025, ch. 784, § 2.5 (Sen. Bill No. 734); Stats. 2025, ch. 721, § 2 (Assem. Bill No. 1071)), but those amendments have no bearing on the analysis of the issues before us.

objective observer, explicitly or implicitly appeals to racial bias." (§ 745, subd. (h)(4).) We consider the specific examples in more detail below, addressing them in chronological order.

### a. Statements made during in limine hearings

While discussing a potential defense witness who may have been deported, the trial court meant to observe, in Latin, that deportees have an intent to "return." The court initially used the word "*furandi*," which means "steal," but quickly corrected itself, substituting "*revertendi*."[32] On this record, the trial court's aside about deportees (who may be of any race, ethnicity, or national origin) does not violate the RJA because its comments were not directed at appellants (or to any cognizable group that appellants may be part of) and thus did not "exhibit[] bias or animus towards" appellants "because of [their] race, ethnicity, or national origin."[33] (§ 745, subd. (a)(2).)

During in limine hearings, the court considered two text messages between Hepburn-Martin and others which contained a variation on the "N" word, ending in "a." During the discussion of whether the text messages should be admitted into evidence, both Hepburn-Martin's attorney and the trial court quoted the texts. However, it is clear that, in using the word in question, the court was "relating language used by another that is relevant to the case" (§ 745, subd. (a)(2)) and therefore its usage also does not violate the RJA.

---

[32] We do not attest to the accuracy of the trial court's Latin.

[33] There is nothing in the record which definitively establishes appellants' race. Luna testified that the three men who came into Bryan's room that night were "African American" but also said that Cornejo appeared to be of "mixed" race. Her testimony was based entirely on this one encounter, however, and is not conclusive on the matter. Assuming appellants are African American or Black, it is still their burden to demonstrate that the court's remarks were "about" their race or "exhibited bias or animus towards" them "because of [their] race." (§ 745, subd. (a)(2).)

Another in limine discussion involved the meaning of a phrase, "Where da licks?" in a text that Richard sent to Hepburn-Martin before the shooting. The prosecution theory was that these words meant "robbery," but the defense contended that these words meant "to hustle and get money quickly," "drug deals," or "different things."

Therefore, the issue before the court was related to the parties' competing interpretations of what this particular phrase, communicated between the defendants prior to the murder, meant and whether it was appropriate to allow the parties to utilize a police officer or other experts to testify about those competing interpretations for a jury. Before reaching a decision, the court analogized the parties' lengthy discussion about the phrase's meaning to a scene from the movie *Airplane!* Though the scene in question invokes a racialized and satirical interaction between a white flight attendant, two black passengers, and a white passenger in a movie, appellants have not articulated the manner in which the trial court's reference to this scene "used racially discriminatory language about the defendant's race, ethnicity, or national origin" or was "otherwise exhibit[ing] bias or animus towards" appellants "because of [their] race, ethnicity, or national origin." (§ 745, subd. (a)(2); see *People v. Coleman* (2024) 98 Cal.App.5th 709, 722–723 [assuming defense counsel advised her client to use "slang terms regarding defendant's manner of speaking, when considered in the context of giving advice to testify authentically, we find no violation of the RJA"].) Although we certainly do not condone the mention of this scene from *Airplane!* by the trial court, appellants have not explained how the movie reference, in the context of the dispute about how the court should allow the parties to use expert witnesses to interpret "Where da licks?" for the jury, reinforces negative stereotypes about "Black speech." Beyond conclusory statements in their briefs,

they have not explained how these references to the movie exhibited bias or animus towards the defendants because of their "race, ethnicity, or national origin." (§ 745, subd. (a)(2).)

While such a showing might be theoretically possible, it has not been made here. The burden is on the appellants, not the courts, to set forth relevant arguments and supportable evidence under the RJA. Furthermore, appellants offered no evidence showing how an objective observer would view the trial court's reference to the *Airplane!* scene as "explicitly or implicitly appeal[ing] to racial bias." (§ 745, subd. (h)(4).) On this trial court record, appellants have not established error under the RJA.

Finally, while discussing the admissibility of a photograph posted on social media which showed Richard and two other men, *neither of whom were Hepburn-Martin or Cornejo*, at a shooting range,[34] the trial court commented that the hairstyle of the man with "long dreads" in the photograph is "pretty generic" before opining "like half the NFL does these days. [¶] It's kind of a cool look actually. Makes them all look like lions."

We disagree with appellants' assertion that the trial court "compared Black men who had dreadlocks to animals (lions)." Again, in setting forth a claim that a violation of the RJA has occurred, the appellants have the burden of proving that the trial court used "racially discriminatory language" or "exhibited bias or

[34] Hepburn-Martin's counsel stated that one of the men "kind of has hair similar" to "Cornejo['s] hairstyle at the time [of the shootings,] … [whereas] [t]he other [man] kind of has short hair, which I believe [] Hepburn-Martin had at the time [of the shootings]." Sergeant Davies testified that Hepburn-Martin's hairstyle has apparently always been similar in length (i.e., short) to how it appeared in court and photographs of Hepburn-Martin on social media did not show him with dreadlocks. Luna testified at trial that one of the men she saw in Bryan's bedroom had hair that went below his ears that "wasn't dreadlocks" or "braids," but was "kind of twisted."

animus" towards appellants because of their "race, ethnicity, or national origin." (§ 745, subd. (a)(2)). While the court expressed its belief that the dreadlock look was "kind of cool" and those with that hairstyle, including NFL players, "look[ed] like lions," the appellants have not established through the record the court was associating dreadlocks to a particular race, ethnicity, or national origin. Specifically, they have not provided any evidence that the dreadlock hairstyle is limited to being worn only by "Black" men such that the court's reference to a lion could have only meant a specific race, ethnicity, or national origin.

Nor does the record reflect that the trial court was in fact "compar[ing] [appellants] to an animal" (§ 745, subd. (h)(4)). Specifically, there is no evidence that appellants had dreadlocks at the time of trial or before which might lead to an inference that when it was referencing "lions," the trial court was referring to appellants in any way. For example, appellants have not cited anything in the record, such as testimony or exhibits, which indicate appellants had dreadlocks. Appellants have not asked that we take judicial notice of any evidence that connects that specific hairstyle with African Americans or Blacks in general such that it could be argued the trial court's statements were in fact directed at appellants. Therefore, appellants have not established by a preponderance of the evidence that the language used by the trial court "compare[d] the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin." (§ 745, subd. (h)(4).)

### b. Comments on appellants' skin tone

During trial, at the conference on jury instructions, and during the hearing on the motion for a new trial, there were discussions regarding the various shades of skin color of the suspects. In fact, the testimony of the three eyewitnesses, Solorzano, Luna, and Diane, as to the skin color of the men they saw that night,

was somewhat inconsistent.  Solorzano testified that Hepburn-Martin was a "light-skinned black dude."  Luna described Cornejo as "medium" complected (and testified the other two men had "darker" skin), whereas Diane described him as "light skinned."  On each occasion, the trial court commented that, in his opinion, none of the defendants could be described as "dark-skinned" and all had lighter skin than himself.  The court's comments, while arguably gratuitous, do not violate the RJA because they "relat[e] language used by another [i.e., Solorzano, Luna, and Diane] that [wa]s relevant to the case."  (§ 745, subd. (a)(2).)

### c. Racial slurs

Finally, we address the trial court's use of several racial slurs used by others during a discussion about whether to allow a potential defense witness to testify that Bryan had called an Asian police officer a "Chinaman."  After the prosecutor suggested that there was a time in history where that word was "more socially acceptable," the trial court pointed out people in the past "also used words like 'nigger' and 'spick' and 'hebe' and things like that too."  While the trial court's recounting of these racial slurs by other people is discomfiting, the context of the court's exchange with the prosecutor makes clear that the trial court was explaining that common usage of racial epithets in the past by Bryan (in his exchange with a police officer) cannot justify their usage in any era.  More specifically, in finding little credence in the position taken by the prosecutor, the trial court found that people of that era who directed racially pejorative terms, like "Chinaman," toward Asian people, used similarly racially pejorative terms toward Blacks, Latinos, and Jewish people.  Although we do not suggest it was advisable for the court to provide specific examples of such pejorative and racist terms spoken *by others* toward different racial groups, appellants have not explained on appeal how this alone or in conjunction with any other statements was a violation

43

of the RJA or was directed "towards the [appellants] because of the [appellants']
race." (§ 745, subd. (a)(2).)

The Legislature enacted the RJA "with a stated aim 'to eliminate racial bias
from California's criminal justice system' and 'to ensure that race plays no role at
all in seeking or obtaining convictions or in sentencing.' " (Stats. 2020, ch. 317, §
2, subd. (i).) Although we do not find appellants have met their burden of
establishing a violation of the RJA on this record, we caution the trial courts that
the interjection of *any* irrelevant comments about race, ethnicity, or national origin
will be appropriately and carefully scrutinized under the statute. Therefore, we
strongly suggest that judges and practitioners fully appreciate how tangential
references to movies, hairstyles, or language, although possibly not a violation of
the RJA, may still cause our reviewing courts and the public to question the
propriety of making such references or statements in a trial court setting.

### III.    DISPOSITION

The judgments are reversed, and the convictions are vacated. The matter is
remanded for possible retrial on counts 1 and 2. Following any retrial and
resulting conviction(s), if any, on counts 1 and 2, the trial court shall reinstate
appellants' convictions on counts 3 and 4 and resentence appellants under current
law.

_____
WILSON, J.

WE CONCUR:

_____
DANNER, ACTING P. J.

_____
BROMBERG, J.

*The People v. Hepburn-Martin et al.*
H046342